## James G. Barclay et al. v. The People, ex rel. Lottie T. Bleakley.

### Gen. No. 4,626.

1. MOTION TO STRIKE—*when not part of record.* A motion to strike a part of the return and the exception thereto are not parts of the record proper unless made so by bill of exceptions.

2. ADOPTION OF CHILDREN—*when irregularity cannot be urged.* A failure to observe the statutory regulations of another state with respect to the adoption of children cannot be urged by one who has requested and caused the irregularity.

3. CUSTODY OF CHILDREN—*what consideration prevails where issue as to, arises upon habeas corpus proceeding.* Where a proceeding by *habeas corpus* puts in issue the question of the custody of a child, the prevailing consideration is the best interests of the child.

Petition for *habeas corpus.* Error to the Circuit Court of Rock Island county; the Hon. EMERY C. GRAVES, Judge, presiding. Heard in this court at the April term, 1906. Reversed and remanded. Opinion filed April 10, 1907.

BURTON F. PEEK, HARRY M. MCCASKRIN and CYRUS E. DIETZ, for plaintiffs in error.

W. R. MOORE and WALTER H. SAUNDERS, for defendant in error.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On May 26, 1905, Charlotte E. Bleakley filed a petition in the Circuit Court of Rock Island county, stating that she is a citizen of Lawrence, Kansas; that Edith Bleakley, her daughter, aged fifteen months, is restrained of her liberty by James G. Barclay and Stella Barclay, of Moline, in Rock Island county, by virtue of so-called adoption papers which are illegal and void for lack of compliance with the law concerning the adoption of minor children; that said adoption papers were obtained by fraud and misrepresentation; and that her husband, the father of said Edith Bleakley, refuses to join in the petition. The petition prayed for a writ of *habeas corpus* commanding said Barclays to bring said child before the court and show the cause of her detention. A writ was ordered and issued. The respondents filed their return, and afterwards amended the same. They therein set out at length the history of the child as hereinafter more fully detailed and averred that said child was found by them in an incubator in the St. Louis Exposition held at St. Louis, Missouri, in the year 1904, and that the child was said to have been delivered to that institution by a certain midwife, and that said midwife informed respondent, Stella Barclay, that the mother of said infant was a Mrs. Bleakley, of Lawrence, Kansas. They set out the steps by which they procured adoption papers from the relator and her husband, and that they adopted said child and received her and have ever since treated her as their own; that though they were informed by the midwife that said child was born on February 15, 1904, and that the relator was its

mother, yet they had no further knowledge of the
parentage of said child, and that at the time of and
since the adoption of said child they had heard con-
flicting statements of said midwife concerning the
parentage of said child, and therefore they denied that
said child is the child of said Charlotte Bleakley; but
they also averred that if she is the mother of the child
she has surrendered all care and custody of her to
these respondents and that the best interests of the
infant require that they retain such custody. On June
14, 1905, the relator filed an answer to said return and
in said answer set up the statutes of Missouri pro-
viding for the adoption of children by deed, and pointed
out various respects in which said deed of adoption
was alleged not to be in compliance with said statute.
The relator also alleged in said answer that at the
time of the execution of said deed of adoption she and
her husband were residents of the State of Kansas;
and she set out various statutes of Kansas relative to
the adoption of children and alleged that said deed of
adoption was not in conformity with said statutes of
Kansas. The relator then by way of further answer
to said return alleged that said deed of adoption was
null and void because it was procured by fraud and
misrepresentation, the details of said alleged fraud
and misrepresentation being set out at length. The
fraud and misrepresentation, however, was not alleged
to be the act of the respondents, but of others, and
especially of her husband's father. She also set out at
length that she left her husband before the birth of
said child because of the cruel conduct of her husband,
and unavailing efforts she had made before and since
the commencement of this suit to induce her husband
to join her therein. On June 17, 1905, the cause came on
for trial. On July 14, 1905, the court entered an order
finding said deed of adoption null and void: that the
child was the daughter of the relator and her husband,
and was born February 15, 1904; that said child is
illegally held in custody by the respondents; that the

relator is a fit person to have charge of her daughter and able to provide for her, and that the best interests of the child require that the relator should have the custody of said child. It was adjudged that the said deed of adoption was null and void, and that the respondents deliver said child to the relator. This is a writ of error sued out by the respondents to review said judgment.

The clerk has copied into the record a motion to strike out from the return the clause to the effect that though respondents were informed by said midwife that relator was the mother of said child, yet they have no knowledge of its parentage and have heard conflicting statements of said midwife concerning its parentage and therefore deny that said child is relator's child; and has also copied into the record an order granting said motion, and has stated in said record that respondents excepted thereto. Said supposed motion is in writing and sets out certain grounds upon which the motion is alleged to be based. The motion and the ruling of the court and an exception thereto are not in the bill of exceptions. The rule is familiar that action of a court such as sustaining a demurrer to a declaration or plea is reviewable on appeal without a bill of exceptions. Bennett v. Union Central Life Ins. Co., 203 Ill. 439; Burke v. C. & N. W. Ry. Co., 108 Ill. App. 565. But that rule does not apply to a motion to strike pleadings from the files, as held in Snell v. Trustees, 58 Ill. 290; Harms v. Aufield, 79 Ill. 257; Gaynor v. Hibernian Savings Bank, 166 Ill. 577; and Van Cott v. Sprague, 5 Ill. App. 99. In Gaynor v. Hibernian Savings Bank, *supra*, the court said that the action of the court in striking a plea from the files cannot be considered unless the motion and decision, and an exception thereto, are included in a bill of exceptions, and that unless so included they do not become a part of the record; and that as a case might occur where an order striking them from the files would be proper it would be presumed, in the ab-

sence of a bill of exceptions, that a proper case for
the order was made. In Van Cott v. Sprague, *supra,*
the court, by McAllister, J., stated what rulings.
upon pleadings could be re-examined in the Appel-
late Court without any exceptions or a bill of ex-
ceptions, and then stated that various other rulings
may be made in the progress of a cause which do not
belong to the record proper and require to be pre-
served in the bill of exceptions with proper exceptions,
and placed in the latter category all motions and
orders striking pleas from the files. The supposed
action of the court in ordering a paragraph of the re-
turn stricken out is therefore not before us for our con-
sideration.

The record discloses the following facts: Relator
and Joseph J. Bleakley were married August 13, 1903.
They lived with her husband's parents and lived un-
happily, and she left him and went to St. Louis, reach-
ing there December 17, 1903. She was directed by the
Young Women's Christian Association to a Mrs.
Wheelan, who gave relator employment. On February
9, 1904, she went to a lying-in hospital or sanitarium
conducted by Mrs. Merrifield, a midwife, where a fe-
male child was born to relator on February 15, 1904,
186 days after her marriage. Two days later relator
was taken ill with scarlet fever. On February 23,
1904, she wrote a letter to her husband in which she
told him of the birth and death of this baby, and
that though a wee little thing, her features were
perfect and she was the very image of her father,
and that even one little leg was curved just a
little where her husband's was broken; that they
only let her have the baby a few minutes and then
took her away and she never saw the baby again;
that she insisted on a nice white casket and a grave
in one of the best cemeteries, and had paid $15
of that expense, and wanted her husband to send
her $40 of which $25 was for her bill and $15 was
for the other half of the funeral expenses. Long after-

wards she told her mother-in-law and her father-in-law about the curve or crook in the baby's leg, corresponding to the condition of her husband's broken leg. But she testified that when the child referred to in this letter was brought to her she was just coming out from under the influence of chloroform and was very sleepy, and her counsel insist that her statement about the curve in the baby's leg is an illusion. She also testified that she was told the child so brought to her was dead, and that she believed it was dead. She telegraphed for her brother, who came from Kansas and found the place very undesirable and his sister's condition very deplorable. He called in a Dr. Burford and they removed her to Bethesda hospital on February 27, 1904. Her mother was sent for and came. Relator was very ill, but recovered, and was taken to her home in Kansas the last of April or first of May. There is a letter in evidence written by relator to her husband from which her counsel ask us to draw the inference that their child was begotten before their marriage; that this caused the trouble between herself and husband, and caused her to leave him before her condition was known to the relatives, and that the child was not of premature birth. She testified that her husband was very anxious she should not have the child, and that what he wanted her to do threatened her life, and she would not stay with him any longer. There is proof that Mrs. Merrifield told relator's brother and afterwards told her father-in-law that relator's child was stillborn; that Dr. Burford told a witness that Mrs. Merrifield told him that relator's child was alive, and showed him a well developed child as relator's child; and Mrs. Barclay, one of the respondents, testified that Mrs. Merrifield told her that the relator was the mother of the child in the incubator hereinafter referred to. Relator and her mother testified that this child resembled relator's husband. In a letter to her mother-in-law, written long afterwards, relator stated that there were other pa-

tients and other babies at Mrs. Merrifield's house. Some baby incubators had been taken to the Deaconess' Hospital before it was time for them to be placed in the grounds of the Exposition. On April 22, 1904, Mrs. Merrifield called up the office of the physician in charge of the baby incubators and told them she had a child that was very sick. On April 23rd, Miss Kelly, a nurse at said hospital went to Mrs. Merrifield's at the request of said physician, and got the child whose custody is now in issue, and took it to the hospital, and put it in the incubator. According to her testimony it weighed one pound and fifteen ounces. Miss Kelly had partial charge of the child in the incubator. The record kept at the incubator by nurses at said hospital named the child "Edith Brown" at the head of the record, and another page of the record was headed "Edith Darwin Brown." Miss Kelly had been a nurse for ten years, and she testified that in her opinion the child which she took from Mrs. Merrifield's on April 23rd, was not of premature birth; that the child was registered as Edith Merrifield, and was called Darwin because she looked like a chimpanzee, and why called Brown she did not know. She testified that in her judgment this child was born six, seven or eight weeks before she took her to the incubator. About the first of May the incubators were removed to the Exposition grounds.

The respondents had been married in 1902, and lived at Elmira, New York. Mr. Barclay went to the Exposition in 1904 to take charge of a certain exhibit. His wife, Stella Barclay, went with him, and also had employment on the Exposition grounds. She visited the incubators and saw this child, and became much interested in her. After a time Mrs. Barclay was employed at the incubators, and became much attached to this little girl. As the end of the Exposition approached she desired to adopt this child. She learned from the people in charge of the incubators that the child came from the lying-in hospital of Mrs. Merrifield. She visited Mrs. Merrifield and received such

information as to the parentage of the child that as a result Martin, a man in the employ of the incubator company, went to Kansas carrying with him papers consenting to the adoption of the child by the respondents, which papers were drawn to be signed by relator only. Relator refused to sign them unless her husband also signed. It was arranged that Martin should return to St. Louis, and send to Mr. Bleakley, senior, relator's father-in-law, other papers prepared for the signature of both relator and her husband. Such papers were prepared and sent. Before they were executed Mrs. Barclay wrote a long letter to relator, and relator wrote a long letter in reply. These papers required to be executed before a notary public, and the father-in-law desired that they be not executed where the parties lived, apparently because of the notoriety and scandal to which the facts would give rise. Relator and her husband went to a brother of relator's husband who lived in an adjoining county and who was a notary public, and they there executed and acknowledged the adoption deed on November 9, 1904, and also a certain order on the incubator people hereinafter mentioned. Relator placed these papers in the hands of her father-in-law, with instructions that he should go to St. Louis and investigate the question whether this was really her child. She testified that Mr. Bleakley agreed not to use the papers if the child was hers. He testified that the instructions were to see the child and make the best investigation he could, and if he was not satisfied the child was relator's, then to deliver the papers, but if he had sufficient proof to justify him in believing that the child was hers, then he should retain the papers. Relator then wrote to Mrs. Barclay that she had left the matter with Mr. Bleakley, her father-in-law. Mr. Bleakley, senior, went to St. Louis. He first went to see the baby in the incubator. He had seen the letter from relator to her husband, written soon after her confinement, in which she said that her child had a leg which was crooked

where her husband's leg had been broken, and he testified she had told him the same thing. He looked at the limbs of this child and saw that they were regular and perfect; he went to Dr. Burford and heard his statement that Mrs. Merrifield told him relator's child was living. They went together to Mrs. Merrifield and he was told by her that relator's child was still-born. He went back and examined this baby again. He testified that, after a couple of days' reflection, he reached the conclusion that this was not relator's child. He then delivered the papers to respondents, and on November 16th they signed and acknowledged them before a notary public; and then presented them and an order for the child to the company in charge of the incubators, and received the child. They re-named it Dorothy Barclay. In February following they caused the deed to be recorded with the recorder of deeds at St. Louis, and they testified that they at first withheld it from record at the request of relator, to avoid publicity. Thereafter they lived in several places temporarily, and finally acquired a home in Moline. Relator testified that it was not her intention that these papers should be delivered to respondent unless this was not her child; that in the winter following she went to St. Louis and made such an investigation as satisfied her that her child was alive and was the child which the respondents had taken, and after much inquiry she traced the respondents to Moline, and came there to get the child and, failing in that, instituted this proceeding. It will be seen that this proof is far from conclusive in favor of relator's allegation that she is the mother of the child now in question, though it perhaps creates a reasonable probability that she is.

It is clear from the evidence that when the Barclays went to St. Louis they abandoned their residence in Elmira, New York. They sold part of their household goods and stored the rest, and had no intention of returning to Elmira. Mr. Barclay went to St. Louis

to manage the exhibit of agricultural implements by his employers, Deere & Mansur Co., at the World's Fair. That engagement did not extend beyond the period of the Fair. He had no plans as to his home or employment after the close of the Fair. He had under consideration plans which involved his remaining permanently in St. Louis, but those plans were finally abandoned. But during the World's Fair the home of the respondents was in St. Louis. They had no other home, and had no other place under consideration for a home. The child was in St. Louis, and had never been anywhere else. The deed of adoption was executed and acknowledged by relator and her husband and by respondents with all due legal formalities. Relator requested them not to record it, because she wished to avoid the publicity which might result from its being made a matter of public record. We think after making that request she cannot be heard to say it is void because not recorded either in St. Louis county or in the county where relator and her husband resided in Kansas. After respondents heard that relator was inquiring for their address, they filed the deed for record in St. Louis county. So far as this case depends upon contract rights, we conclude respondents were entitled to the child, unless the deed was obtained by fraud and was therefore not binding upon relator.

Relator claims that in the negotiations which led up to the execution of the deed of adoption she did not believe that this was her child, and was willing to give a sort of quit-claim to enable respondents to obtain a child in which the relator had no interest. The correspondence in evidence does not bear out this position. After Martin returned from Kansas with word that relator would not sign adoption papers unless they made her husband a party to the deed and unless it was executed also by him, and that new papers were to be prepared and forwarded to relator's

father-in-law for execution by both relator and her husband, Mrs. Barclay wrote a letter to relator, which was not dated, but bore the post mark of November 6, 1904. In this letter, after referring to relator's trouble, and Mrs. Barclay's regret that relator had been so unfortunate as to be the victim of such a woman as Mrs. Merrifield, and her pleasure in learning that there was a different side to the story than that which Mrs. Merifield presented, Mrs. Barclay wrote:

"As you already know, my position is this: I would love dearly to have the baby, as I have none of my own, and feel that she would be such a comfort and happiness. If I could only see you and talk over the matter, could then make more plain to you all the little details that go to make my interest in her, but will have to waive all that and simply allow the references I have submitted, as well as your own heart, to govern it all. For myself I will say, if you decide to give me your baby I will do by her as I would do by my own flesh and blood, and give to her the one of God's choicest blessings that has been denied me, a mother's love, as my mother died when I was but a child. My obligations to her would be such that when I had reached the final, and stood before our Father, I could in all truth say: 'I have been faithful always in my duty towards her.' If it should be your desire, we could keep the matter a profound secret, simply between ourselves, as I have managed to get all the information desired from Mrs. Merrifield without allowing her to even know my name, and no one here except Miss Kelly knows of my interest. Would be more than glad to hear from you, and you may be very sure our correspondence will be kept strictly confidential."

Relator replied under date of November 7, 1904. After referring to Martin and to Mrs. Merrifield, relator wrote Mrs. Barclay as follows:

"If the course I am advised to take entails only my loss, I feel I owe it to those who have suffered for my misdeeds to make what reparation I can. And rather than bring upon the two families the notoriety which

it would incur I am willing to deny myself the blessing and pleasure which I know a little daughter would bring me. That, of course, is only secondary. The future welfare of the child is the first consideration. I feel that everything is as it has been represented to me, and that little Edith will never want for anything. A *mother's love* I consider the most priceless gift you can bestow upon her. If she has that, the care, education, and religious training will be of the very best I am sure. I feel that should I relinquish all right you will be a true mother, which is the very greatest desire I will have. If such should be the case I will pray every night so long as my life lasts that God will reward you and help you to bear the trials that come to all mothers. With all my heart I appreciate your interest, though, as you say, not knowing the details I cannot fully understand it. But what woman has not her conjectures? Not knowing what a disclosure to the public of my mistakes would bring upon those I love, the financial embarrassment, and the humility of a fiercely fought case in open court, for such would follow, not knowing all the details you cannot fully appreciate my situation, and perhaps think me devoid or incapable of maternal feelings. That is not the case. It is this: If without doing violence to the feelings of my husband (who I feel would never, without the force of the law, contribute to the support of the child), if he does not wish to make any claim, and I have proof that a good home and *real* parents can be secured, and that all can be done without publicity, if this can be secured, I feel that a brighter and happier future is open to the little one than that which my meagre means could provide. Besides, from my inability to provide as I should wish to do, my recent illness (which you can learn all about at Bethesda Hospital, St. Louis) has left my health very uncertain. Though you cannot fully understand all, I feel very grateful to you for your sympathy and kind wishes, and wish to thank you with all my heart for your letter. As soon as I hear from Mr. Bleakley, I shall write you of our decision.''

Immediately upon receipt of that letter Mrs. Bar-

clay wrote relator a letter, which could not be pro-
duced, but whose contents were thus stated by Mrs.
Barclay as a witness: "I immediately wrote her and
told her that Mr. Barclay had positively refused to
allow me to have anything to do with the adoption of
this baby unless every right, claim and privilege so
far as herself and her husband were concerned were
willingly relinquished. I further told her I wanted
her to consider long and well before she sent me the
papers, because if I once took that weak, frail little
thing into my home and cared for her I never could
have anybody take her away from me without com-
pletely ruining my life. I further told her that we
must take it to share our flesh and blood, share and
share alike, and if we did this I could keep her secret.
I further told her that I didn't want her baby unless
she would allow it to return to the midwife from
whence it came. I further stated that I would do
everything in my power to help her and befriend her,
and was sorry a whole heart full for her."

On November 9, 1904, relator and her husband exe-
cuted and acknowledged the deed of adoption and a
written order, and delivered them to the father-in-law
to be taken to St. Louis. That deed names relator and
her husband as parties of the second part, and states
that they are "mother and father of their daughter
Edith, a minor of the age of nine months, now located
in the baby incubator building on the World's Fair
grounds in the city of St. Louis." It names re-
spondents as parties of the first part, and states as
one of the considerations for their entering into the
contract of adoption, "the love and affection they bear
to the said Edith, infant daughter of the parties of
the second part." They therein adopted said Edith as
their "child, heir and devisee," and agreed to prop-
erly maintain, support and educate her. The deed
stated that relator and her husband "do hereby as-
sent to and acquiesce in the adoption of the said Edith,
their daughter, by the said parties of the first part as

aforesaid, and do hereby release and resign unto the said parties of the first part all legal rights and privileges and all parental rights which they may have to or from the said Edith or to the care and custody of the said Edith.'' On the same day relator and her husband signed an order, addressed to the manager of said Baby Incubator building, the body of which was as follows: "We have given a deed of adoption to Mr. and Mrs. James G. Barclay of our infant daughter Edith, who is in care of your institution, and who was placed in care of said institution by Mrs. Mary J. Merrifield, of 6122 Ella Avenue, St. Louis, Missouri, at whose home the child was born. You will please turn said child over to Mr. and Mrs. Barclay on December 1, 1904, or such date prior to that time as may suit your convenience.'' After her father-in-law left for St. Louis with these papers, relator, under date of November 12, 1904, wrote a letter to Mrs. Barclay, from which we make the following extracts:

"Mr. Bleakley left for St. Louis yesterday, Friday evening, and before this reaches you you will no doubt be in possession of those papers and know more about everything than I can possibly write. * * * Your references I am sure are satisfactory. I have left everything in Mr. Bleakley's hands. Dear Mrs. Barclay, you will never know the extent to which I feel obligated to you and the great cause you have given me for rejoicing that little Edith will have such a mother and such a home. You will be doing more for me than it is possible for any one else on earth to do. And my gratitude is in proportion to your kindness. Sometimes my burdens seem almost too heavy to bear, but God is good, and now I feel that he has sent you to be my guardian angel. You mentioned seeing me sometime. Nothing could give me more pleasure. I think and dream of you almost constantly. You will never know what a comfort your letters and promises of friendship are to me. I will certainly consider you my dearest friend on earth. And I cannot tell you how deeply it touches me when after all your kindness and sympathy you offer to befriend and

help me at any time I need your assistance. In return
for all I can only give you my most heartfelt thanks
and pray earnestly that you will be rewarded for your
magnanimity.  *  *  *  Mr. B——— wishes me to
drop all correspondence and never seek to know fur-
ther of your whereabouts. Of course if you desire it
or think it best I will gladly do so for you. I have im-
plicit faith in you as a woman and feel that I shall
never have cause to regret the confidence I have re-
posed in you. I know it will not be safe to continue
the correspondence. But if you will, grant me the priv-
ilege of always having your address and allowing me
to occasionally make inquiry concerning the health
and happiness of you both. If you can grant all that,
feeling it is for the best, and in the meantime keep my
secret a profound one, I feel that I can really be happy
again.''

Certainly an ordinary person reading these letters
from relator to Mrs. Barclay would conclude that when
relator wrote them she did not then believe that her
own child had died before or immediately after birth,
and that the child described in these letters was one
which she had never seen and with which she had no
concern except the feelings of common humanity.
Such expressions of gratitude, such reference to her
mistakes and family troubles, and to her own meagre
means and inability to provide as she would wish to
for the child, could not naturally have been written
by relator about any child except one that she believed
to be her own. Certainly they were strongly calculated
to convince Mrs. Barclay that she was dealing with one
who believed herself the mother of the child. It is
clear that when relator executed the papers she did
so on condition that her father-in-law should take the
papers to St. Louis and investigate as to whether this
was her child, and if satisfied it was, then to retain
them. But she did not tell that to Mrs. Barclay in the
letter written after Mr. Bleakley, senior, started for
St. Louis. On the contrary, the letter implied that Mr.
Bleakley, senior, was to investigate the references of
the Barclays, and that he had full power to deliver the

Barclay v. The People.

papers if those references were satisfactory. It is no doubt true that Mr. Bleakley, senior, thought it was best for relator and for his son and for the family that it should be ascertained that their child was dead, and the family saved the scandal which would arise from the advent into their neighborhood of a child born 186 days after their marriage, and he may not have investigated as carefully as he should have done; yet he went to Dr. Burford, and went with Dr. Burford to Mrs. Merrifield, and is not shown to have been guilty of any bad faith in that search. He did advise relator to burn the correspondence about the child, and before this trial he turned over to the Barclays what letters he and his wife and his son had received from relator, and he is subject to whatever criticism that act justly casts upon him. But the Barclays were not responsible for any lack of judgment or good faith exercised by the father-in-law. But further, relator soon became dissatisfied with what her father-in-law had done, and, in answer to a letter from Mrs. Barclay, she wrote the latter a very long letter, not dated but mailed December 22, 1904, in which, though she manifested her feeling against her father-in-law, she showed a full belief that this was her own child in the following language: "I dropped the subject, but I never could throw it off my mind for a day. And it is the feeling I have so strong within me that makes me feel that little Edith was my own little girl. I have carried the image of a little baby girl in my heart until it has almost become a part of me. Mr. Martin sent me a little kodak of her and Miss Kelly. I keep it with me whenever I can. It gives me strength and courage and fills my heart with love. Whenever I am tempted to do or think unkind or uncharitable things I always stop to think if that is the way I would want my little daughter to act under the same circumstances. I cannot carry in my heart a constant prayer that she will be good and noble and all that is desirable and not strive to overcome temptations myself, so

her little picture is a source of daily strength to me. * * * Of course, it will not be best to carry on a regular correspondence, but if you will grant me the privilege, as I asked before, of knowing where you are, and occasionally inquiring about little Edith, it will give me great happiness.'' Certainly Mrs. Barclay could not fail to understand that though relator was dissatisfied with what her father-in-law had done, still she intended the Barclays to keep the child, and that, too, with a full belief that this was her child.

It is conceded that the Barclays are in every way fit and proper persons to bring up such a child. They acted in the utmost good faith towards relator and towards this child. When they took it it was helpless and homeless, and was about to be returned to the midwife, and the result must have been that it would soon become a public charge. Probably it would not have lived long under such circumstances. Its condition of health required the most unremitting care when it was taken from the incubator. When relator first learned that it was supposed to be her child she did not hasten to St. Louis and claim it. She gladly accepted the kind offices of Mrs. Barclay for the preservation of the child. Indeed, before relator first left St. Louis Dr. Burford told her that Mrs. Merrifield had told him that relator's child was alive. She did not go to Mrs. Merrifield to investigate and ascertain whether it was true that her child was alive before she returned to Kansas. After she had returned to Kansas Dr. Burford wrote relator in August, 1904, that Mrs. Merrifield had again told him that relator's child was alive and doing well. Relator made no effort then to have the truth of this report investigated. However hardly relator may have been dealt with by her husband and his family, the Barclays were no party to that; and if relator thought this was not her child, or if she intended to reclaim it if it turned out to be her child, then she did not deal frankly with Mrs. Barclay.

Mrs. Barclay took the child sometime about the mid-

dle of November, 1904, and received it from the arms
of Mr. Bleakley, senior, its grandfather, if it is rela-
tor's child. She kept it till the day judgment was
rendered in this case, July 14, 1905. She had and cared
for it for about eight months. It is evident that her
care for this little waif for those eight months caused
her to become deeply attached to it. If this is rela-
tor's child it was then one year and five months old.
So far as the rights of the two women are concerned,
it seems to us those of Mrs. Barclay are superior. She
has cared for the child. Relator, with knowledge that
there was reason to belive it was her child, gave it up,
and led Mrs. Barclay to believe she did so willingly
and gladly. She waited many months before she began
to hunt for it. When the court below turned it over to
her she had never had or cared for it an instant. Mrs.
Barclay ought not to be punished for the delinquencies
of relator's husband and family. But the prevailing
consideration should not be the respective rights of
the parties; it should be, what is for the best interests
of the child. In our opinion it was not for the best
interests of this child, nearly a year and a half old,
to take it from a comfortable home where it had re-
ceived all proper care and affection for the last pre-
ceding eight months, and give it to relator, who had
never had it or cared for it, but who had knowingly
relinquished it, and who does not know that she is its
mother. We hold that on July 14, 1905, the court
should have decreed that the best interests of the child
required that it be left with the respondents. We
confine ourselves to stating what the judgment should
have been at that time. Respondents did not bring
the cause to this court at the next term, in October,
1905. They did try to bring it here by writ of error
to our second term thereafter in April, 1906, but failed
to get service by proper publication, so that the case
did not reach us till the October term, 1906, one year
later than respondents might have brought it here.
Relator has now had and cared for the child about a

year and nine months. Whether it would now be for the best interests of the child that it should be taken from relator and returned to respondents we cannot decide upon the present record. Relator's argument here states that after the Barclays delivered the child to her in conformity with the judgment of the court, she returned to her home in Kansas and took the child with her. The decision of the Supreme Court of Kansas in the case entitled Charlotte E. Bleakley v. Charles A. Smart, Judge, 87 Pacific Rep. 76, shows that respondents and relator are litigating the custody of the child in that state, where the child now is, and doubtless the courts of Kansas will determine what is for the best interests of the child under present conditions, so that it may be that our decision will really only determine the question of costs.

For the reasons stated the judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*